IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 13 |
| MATHEW W. GOODVIN, ) | |
| ) | Bankruptcy No. 15-01039 |
| Debtor. ) | |

**ORDER RE CREDITOR CHRISTINE BRENDEN'S MOTION TO DISMISS**

This matter came before the Court for an evidentiary hearing in Sioux City, Iowa. Don Molstad appeared for Debtor Mathew Goodvin ("Debtor"). R. Scott Reinhart and Wil Forker appeared for Creditor Christine Brenden ("Christy"). Carol Dunbar, Chapter 13 Trustee, also appeared. The Court took the matter under advisement. The parties filed briefs. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A)

## STATEMENT OF THE CASE

Debtor owns part of Goodvin Farms, Inc. ("GFI"), his family's farming corporation. Debtor and Christy Goodvin were married, but later divorced. Christy was not an owner of GFI. In their divorce, the value of Debtor's interest in GFI was a central issue. The Iowa District Court in its divorce decree found that Debtor's interest in GFI had significant value. It ordered Debtor to pay Christy a property settlement to offset his valuable interest in GFI. After the divorce, Debtor filed bankruptcy. Debtor stated on his bankruptcy petition that his interest in GFI had no value.

Christy argues that GFI has substantial value, but that Debtor's father has improperly drained value from GFI. Christy argues that this Chapter 13 case should be dismissed because Debtor filed in bad faith. At a minimum, she argues that Debtor's Chapter 13 Plan, which treats his interest in GFI as having no value, should not be confirmed. Debtor resists dismissal. Debtor argues that GFI owed his father money and that the Iowa District Court failed to take GFI's liabilities into account in its valuation. Debtor also has filed a modified Chapter 13 plan that seeks to replace the plan that was at issue in this hearing.

The Court finds that, while the totality of the circumstances readily indicates bad faith, the Court will withhold ruling on dismissal until a hearing on the modified plan.

## FINDINGS OF FACT

Debtor's father, Virgil Goodvin, and mother, Jackie Goodvin, created GFI in 1991 to assist in passing the family farming operation on to their children. Debtor was in high school at the time. Virgil put his own machinery into GFI to get it started. GFI never owned real estate. GFI rented ground and owned machinery. GFI farmed about 1200 acres. Virgil and Jackie own about 800 or 900 acres of this land. GFI rents this land from Virgil and Jackie. Debtor was gifted or earned a 49% interest in GFI early on. GFI ceased operations in 2015, after the divorce was finalized.

Virgil is not and has never been a shareholder of GFI. However, Virgil wrote 99% of the checks for GFI. Virgil also ran the books for GFI along with Rob Scott, GFI's accountant.

In January 2006, Debtor and Christy got married. During their marriage they both worked for GFI. They did not receive wages, salary or distributions from GFI for this work. Instead, GFI paid for their housing, utilities, and vehicles. They also received cash from GFI when requested. In addition to his work for GFI, Debtor worked 36 hours a week as a truck driver.

Christy filed a petition for dissolution of marriage in Iowa District Court for Woodbury County in September 2012. Debtor and Christy were divorced in November 2013. The Iowa District Court made specific findings of fact after a trial in the divorce case. This Court relies on and adopts those findings. The most relevant portion of those findings follows:

> Goodvin Farms is a premarital asset of Mathew. However, during this marriage, Mathew has taken an increased role. Virgil is on social security and is involved but not to the extent of Mathew. While Mathew minimizes Christy's involvement, there is no doubt she and her family has helped at different times over the years. Most testimony stated Christy enjoyed being outside and helping with the farm operation. Christy was not employed outside of the home during most of their marriage. . . . A significant amount of time was spent over the value of this family farm corporation. The evidence is conflicting and to some extent confusing. The court heard evidence of a hog operation but saw no income. The court assumes this must be Virgil's asset. The tax returns provided during the course of the discovery upon rebuttal testimony proved to be inaccurate, according to their own tax preparer. A significant amount of time and expense

> was spent in valuing this asset . . . . The court finds Craig Merry's valuation to be more persuasive than the testimony offered by Mathew or his father. The court finds the pre-marriage value of this corporation to be insignificant or a negative net worth. The court finds due to the increased involvement of Mathew, this corporation has increased in value during the parties' marriage. The court finds Mathew has not received a regular "draw" from this corporation, but instead was paid through housing, utilities, motor vehicle, auto insurance and periodic cash payments. The court did not hear any specific testimony on the planted crop, other than it should be treated as comparable to prior years' crop, yet the court heard evidence of damaged crops, crop insurance proceeds and is uncertain whether they are comparable or not. The court finds this corporation has a value of $571,823 with a tax liability of $109,948 for a net value of $461,875. Mathew has a 49% interest and is valued at $226,318. The court finds it appropriate to include the tax liability deduction. The court also finds this includes and takes into consideration all assets and liabilities testified to during the course of this trial. The court finds the premarital value of this corporation to be insignificant and that the value has taken place during the parties' marriage and is a martial asset.

In re Marriage of Goodvin, Equity No. CDCD123661, slip op. at 14–16 (Iowa Dist. Ct. Nov. 12, 2013). The Iowa District Court also found that "Mathew was not forthright in providing financial information to value the family farm corporation and ultimately through his own witness it was disclosed the most recent tax returns provided were not the tax returns filed." Id. at 17. In addition, the Iowa District Court found that "there is no doubt Mathew and his family have been less than forthright" and "did not produce timely and accurate information" about GFI and its finances. Id. at 15.

The Iowa District Court concluded that "Mathew should pay to Christy $93,325.38 as an equalization payment that would have each party leaving with a comparable net worth and allow Mathew to retain his interest in the family farm corporation." Id. at 16. That equalization payment is the basis of Christy's claim in this bankruptcy case.

Debtor appealed the divorce decree. He claimed, among other things, that the Iowa District Court incorrectly calculated GFI's value and his percentage ownership of GFI. On March 25, 2015, the Iowa Court of Appeals affirmed the Iowa District Court on these issues. In re Marriage of Goodvin, 863 N.W.2d 301 (Iowa Ct. App. 2015).

On July 18, 2015, Debtor filed this Chapter 13 bankruptcy. Debtor stated on his bankruptcy petition, and claimed at the hearing, that GFI had no value. Debtor asserted in his testimony that the Iowa District Court did not take GFI's liabilities into account in its valuation. Debtor testified that he owes Virgil money for attorney's fees. Debtor also testified that GFI owes Virgil money.

Between January 2013 and March 2015, Virgil Goodvin wrote checks to himself out of GFI's account totaling $650,425.07. When presented with these checks at the bankruptcy hearing, Virgil testified that some of the checks were cash rent for his land. Virgil testified that most of the checks were money he took out and then put "right back into" GFI. Virgil testified that "had to do this to keep it

5

active" according to his accountant. There was no evidence that this money actually got back into GFI. When asked directly whether or not Virgil was taking money out of GFI, Debtor said that he did not know.

Christy testified that she never heard anything about GFI owing Virgil money. Christy also testified that she never heard anything about loans from GFI to Virgil. Christy testified that Debtor had initially said that his parents owned all the farm equipment. Christy testified that, after certain tax returns were filed, Debtor said GFI owned this equipment.

Sometime before the bankruptcy, Debtor purchased an expensive new truck. Virgil testified that he cosigned the loan for the truck. Debtor claims that he realized he couldn't make the payments and asked Virgil to take over. Virgil testified that he paid off the truck for Debtor. Debtor testified that he continues to drive the truck. Debtor said that the paperwork supporting these transactions would be provided. Debtor has not provided this paperwork.

This Court has no desire to revisit the Iowa District Court's findings of fact that Debtor seeks to collaterally attack here. Even if the Court did revisit or independently address those facts, it would reach the same conclusions. The Court is not persuaded by Debtor's or Virgil's attempts to explain these transactions. Debtor's and Virgil's testimony was confusing. When confronted with documents that did not line up with their explanations, they claimed to be unfamiliar with

6

GFI's finances. Virgil repeatedly stated that Bob Scott, GFI's accountant, did all the finances and Virgil himself had nothing to do with it. Bob Scott did not testify. Virgil stated that certain checks were actually the bank automatically pulling money out of GFI's account to pay GFI's operating loan. Virgil's testimony is in conflict with the face of those checks, which say "funds transfer to Virgil Goodvin" and "authorized by Virgil Goodvin in person."

These findings are certainly consistent with the Iowa District Court, which found that Debtor and his family were "less than forthright" about GFI's finances and value in the divorce proceedings.

There was some testimony about whether Medicaid would cover Debtor and Christy's son's medical bills. There was also discussion that indicated these issues may be resolved. This issue was left up in the air at the close of the hearing.

The parties did agree on an issue relating to GFI's farming equipment. They agreed that, except for the pickups and homes, all equipment should be sold. This sale has apparently occurred.

After the hearing on this matter, Debtor filed a modified plan that proposes hiring an independent appraiser to evaluate GFI and what happened to its cash between 2013 and 2015. That plan has not come before the Court for hearing. There is no indication whether this modified plan will satisfy the disagreements about the money from GFI.

## CONCLUSIONS OF LAW

Christy first argues for dismissal. The Bankruptcy Code provides

> **on request of a party in interest** or the United States trustee and after notice and a hearing, **the court** may convert a case under this chapter to a case under chapter 7 of this title, or **may dismiss a case under this chapter**, whichever is in the best interests of creditors and the estate, **for cause**, including--

11 U.S.C. § 1307(c) (2012). Subsection 1307(c) then lists 11 such causes for conversion or dismissal. Id. "Bad faith" is not listed as a cause for conversion. See id. The Code specifies, however, that "'includes' and 'including' are not limiting." Id. § 102(3). Thus, the list of causes is not exhaustive—in fact, bankruptcy courts "routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 373 (2007); Molitor v. Eidson (In re Molitor), 76 F.3d 218, 220 (8th Cir. 1996); Marshall v. McCarty (In re Marshall), 407 B.R. 359, 362 (B.A.P. 8th Cir. 2009); In re Vantiger-Witte, No. 05-02931, 2008 WL 4493426, at *3 (Bankr. N.D. Iowa Sept. 29, 2008).

"The bad faith determination focuses on the totality of the circumstances, including whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." In re Marshall, 407 B.R. at 362. "The hallmark of the totality of the circumstances test is that the

factors to be considered may vary in each case." Sullivan v. Solimini (In re Sullivan), 326 B.R. 204, 212 (B.A.P. 1st Cir. 2005) (internal quotation marks and citations omitted). Bad faith is synonymous with lack of good faith. Cabral v. Shamban (In re Cabral), 285 B.R. 563, 572 (B.A.P. 1st Cir. 2002).

> The term 'good faith' is not defined in the Bankruptcy Code and thus, the meaning has been the subject of extensive litigation. Since it is not defined, the inquiry is necessarily a fact intensive determination. Therefore, courts engage in a multi-faceted analysis that is applied on a case-by-case basis. Whether this balancing of equities is called moralistic, judging, or evaluating, it is exactly what the courts have been left with under the ambiguous requirement of good faith.

In re Sullivan, 326 B.R. at 212 (internal quotation marks and citations omitted). "The bottom line is whether the debtor is attempting to thwart his creditors, or is making an honest effort to repay them to the best of his ability. Id. (internal quotation marks omitted). The bankruptcy court has discretion in deciding whether to dismiss a chapter 13 case under § 1307(c). Schlegal v. Billingslea (In re Schlegel), 526 B.R. 333, 339 (B.A.P. 9th Cir. 2015).

This case is Debtor's third attempt to convince a court that GFI has no value. Debtor first failed to persuade the Iowa District Court. Debtor then appealed this issue unsuccessfully to the Iowa Court of Appeals. Now, Debtor files this bankruptcy, again claiming before that GFI has no value. Debtor argues that the Iowa District Court did not take GFI's liabilities into account. Debtor makes this argument even though the Iowa District Court specifically said that its valuation

9

"includes and takes into consideration all assets and liabilities testified to during the course of this trial." In re Marriage of Goodvin, Equity No. CDCD123661, slip op. at 16 (Iowa Dist. Ct. Nov. 12, 2013). This Court would also point out that the Iowa District Court's valuation did not even include the value of GFI's crops in the field as of the divorce decree. Id. Thus, if anything, the Iowa District Court's valuation was on the low end.

The doctrine of collateral estoppel bars Debtor from arguing that the Iowa District Court incorrectly valued GFI at the time of the divorce. "When the parties have litigated an issue in a state court, the collateral estoppel law of that state applies." Woodburn v. Woodburn (In re Woodburn), No. 15-00149, Adv. No. 15-09016, 2015 WL 7820979, at *3 (Bankr. N.D. Iowa Dec. 3, 2015). Under Iowa collateral estoppel law, a party is barred from relitigating an issue if "(1) the issue in the current action is the same as in a previous action, (2) the issue was raised and actually litigated in the previous action, (3) the issue was material and relevant to the previous action, and (4) the decision was necessary and essential to the disposition of the previous action." Id.

Here, the Iowa District Court's valuation of GFI meets all of these elements. GFI's value was raised and actually litigated in the divorce and the Iowa District Court's valuation was central to the disposition of the divorce. Collateral estoppel bars Debtor from relitigating GFI's value at the time of the divorce. As noted

10

above, even if the Court did decide to revisit or otherwise review this issue, it would reach the same conclusion. Although Debtor is barred from collaterally attacking the Iowa District Court's valuation, his attempt to do so is relevant to whether he filed this bankruptcy in good faith.

After Christy filed the divorce petition, Virgil began writing himself checks out of GFI. Debtor and Virgil attempted to explain what happened to GFI's value and what these checks were for. Those explanations were confusing and unpersuasive. Virgil's testimony that he took money out of the GFI account, then put it right back in, to "keep things active" according to his accountant's advice, is particularly confusing. Virgil never testified about what he had to "keep active." Moreover, there was no evidence that this money ever actually got back into GFI. The Court does not believe Virgil's testimony on this issue.

When asked directly whether Virgil was taking money out of GFI, Debtor testified that he simply did not know. GFI was Debtor's most valuable asset about two years ago. Debtor now claims he doesn't know what happened to its cash. The Court does not believe Debtor's testimony on this issue.

Debtor and Virgil also claimed that Debtor's new, high-end truck was actually purchased by Virgil. They did not provide documents to support their testimony about this transaction. Debtor testified he continues to drive this truck.

11

Debtor and his family have a history of papering back over transactions for their own financial advantage. Christy testified that Debtor had initially said his parents owned all the farm equipment and that it was only after certain tax returns were filed that Debtor said GFI owned this equipment. The Iowa District Court in the divorce decree that the tax returns Debtor and his family "provided during the course of the discovery . . . proved to be inaccurate, according to their own tax preparer."

This Court would entirely adopt the Iowa District Court finding that Debtor and his family papered back over past finances and were not forthright in the divorce action. This papering-back over past finances was done to hide Debtor's assets and keep from paying Christy. The checks from GFI to Virgil, the expensive pickup that Debtor still drives but claims his father owns, and the confusing and baseless explanations trying to justify it all, indicate to this Court that Debtor has continued this practice. Debtor is attempting to hide assets, once again, to keep from paying Christy.

The totality of the circumstances supports dismissal under § 1307(c). The Court, however, will not enter an order dismissing the case at this moment. In re Schlegel, 526 B.R. at 339 (noting that courts have discretion about whether to dismiss a case under § 1307(c)). Debtor has proposed a modified plan that provides for an independent appraiser to evaluate GFI. Debtor claims this would

12

help figure out what happened to the cash between 2013 and 2015. A confirmation hearing on this modified plan has been set. The Court withholds ruling on dismissal at least until further developments under the proposed plan are fully considered.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, Creditor Christine Brenden's Motion to Dismiss is **HELD IN ABEYANCE** until the Court rules on Debtor's Modified Plan.

Dated and Entered: March 30, 2016

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE